**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

JOHN P. LIPP and STEPHANIE S. LIPP,   )
                                      )
       Plaintiffs,               )
                                        )
v.                                      )     Case No. 2:15-cv-04257-NKL
                                        )
GINGER C, L.L.C., *et al.*,        )
                                        )
       Defendants.             )
                                        )
                                        )

### ORDER

Before the Court is ACC Defendants' Motion for Summary Judgment, [Doc. 357]. For the following reasons, Defendant's Motion is denied.

I.     **Background**[1]

Plaintiffs, the surviving parents of Jack Lipp, filed suit alleging negligence against Defendants Ginger C, L.L.C., American Campus Communities (ACC),[2] and Roland Management. The suit stems from Lipp's death, which occurred after he fell off a balcony at

---

[1]     Unless otherwise noted, the facts recited are those which are properly supported and undisputed. These findings are for purpose of this Motion for Summary Judgment only.

[2]     The term "ACC Defendants" collectively refers to ACC OP (Turner Ave) OP, ACC OP Development LLC, American Campus Communities, Inc., American Campus Communities Holdings LLC, and American Campus Communities Operating Partnership L.P. American Campus Communities, Inc. is a publicly traded Maryland company organized as real estate investment trust (REIT). American Campus Communities, Inc. is structured as an umbrella REIT and the limited partner in American Campus Communities Operating Partnership, L.P. American Campus Communities Holdings, LLC is wholly owned by American Campus Communities, Inc. and is the general partner of American Campus Communities Operating Partnership, L.P. American Campus Communities Operating Partnership, L.P., is a Maryland limited partnership. The limited partner is American Campus Communities, Inc., and the general partner is American Campus Communities Holdings, LLC. ACC OP Development LLC is a wholly owned subsidiary of American Campus Communities Operating Partnership.

507 South Fourth Street in Columbia, Missouri while attending a party on December 12–13, 2014. Plaintiffs allege Jack Lipp fell because of a defective railing on the balcony.

### A. 507 South Fourth Street

ACC Defendants build student housing and also operate and lease student housing at major universities across the United States. Defendant Ginger C is a company which leases residential properties, including rental properties for student housing. Ginger C had been assembling properties and/or options to purchase property in Columbia, Missouri to attempt to sell the assemblage to a developer for the construction of a student housing project. On April 13, 2013, Defendant Ginger C entered into a contract to purchase the property located at 507 South Fourth Street from Derrow Properties, LLLP. Derrow sold the property to Ginger C on an "as is basis," without providing a seller's disclosure statement.

The agreement between Ginger C and Derrow Properties had as a special condition that the "contract [is] contingent upon approval of rezoning suitable to buyers" and "contract [is] contingent upon buyer and third party developer signing agreement for project." On or about May 7, 2013, a broker for Ginger C contacted an Executive Vice President for American Campus Communities about an assemblage of property that Ginger C was putting together on Fourth Street in Columbia.

On June 8, 2013, ACC and Ginger C entered into a letter of intent for the proposed acquisition by ACC from Ginger C of 3.4 acres of real property. The property acquired for the development was to be redeveloped into a student housing complex; it was not acquired to operate existing rental properties. There were twelve amendments to the Agreement of Sale and Purchase. The Seventh Amendment to the Agreement of Sale and Purchase extended the

inspection period to March 31, 2015, increased the purchase price, and amended the closing of the properties to August 1, 2015.[3]

During the inspection period, as part of its due diligence ACC retained independent contractors to conduct environmental testing, including basic environmental testing, geotechnical (including evaluation of soil) and asbestos containing material survey. The asbestos containing material survey required an entry into 507 South Fourth Street which occurred on July 24, 2013. ACC requested permission from the owners, including Derrow Properties, to make entry on their land to perform the environmental studies. ACC always planned to raze and redevelop the property, so it did not need to understand the condition of the existing structures.

On December 16, 2013, ACC filed an application with the City of Columbia to rezone the Plan Area, which was made up of 12 tracts of land, to a planned unit development with a maximum density of 55 dwelling units per acre and to seek variances of city codes pertaining to the site and the planned development. 507 South Fourth Street was included in the rezoning application. On February 12, 2014, ACC filed an amended application for rezoning, still including the property at issue. On February 20, 2014, a public hearing was held by the City of Columbia planning and zoning commission to consider the redevelopment request. ACC asked the City Council to table the redevelopment proposal, and the City Council did so on March 17, 2014.

A draft investment memorandum dated March 20, 2014 was prepared by Charles Carroll at ACC OP Development which discussed a verbal agreement with Ginger C. Mr. Carroll later testified in his deposition that stating there was a verbal agreement was "a poor choice of words." On March 24, 2014, Charles Carroll wrote to Nakhle Asmar of Ginger C and

---

[3]     The Twelfth Amendment extended the date of closing to August 11, 2015.

3

stated, "Pursuant to our conversation, please move forward with leasing the subject properties for a period of no more than one year and not extending beyond August 1, 2015." On August 18, 2014, the City Council approved ACC's application for a planned unit development and approved an ordinance approving various contingencies in the development contract and granting variances from the building height and building set-back requirements.

Ginger C did not have funds to close on the Derrow Properties that made up part of the assemblage, including the 507 S. Fourth Street property. So that the development deal could move forward, ACC loaned $2.16 million to Ginger C so that Ginger C could close on the purchase of the Derrow Properties. The loan closed on October 22, 2014 and Ginger C and ACC OP Development entered into a Note. The loan documents included a Deed of Trust, Assignment of Leases and Rents and Security Agreement. As a condition of the loan, Ginger C had to add ACC OP Development as an additional insured. The assembled properties, including 507 South Fourth Street, closed on August 11, 2015, and titled was conveyed to ACC.

**B. December 12 – 13, 2014**

The property at 507 South Fourth Street was leased to four tenants in October 2014, and Derrow assigned its lease with the tenants to Ginger C. There was a balcony on the second floor of the property. The only way to access the second story balcony from the interior of the property was through the door in one of the bedrooms. Christopher Strzalka, the tenant whose bedroom could access the balcony, testified that he kicked the balcony railing off of the balcony prior to September 2014. One of Derrow's maintenance employees made a temporary repair to the balcony railing with two inch by four inch boards in September 2014 after Strzalka had kicked it off. Defendant Ginger C was made aware of the balcony condition and the temporary repair.

4

Two of the tenants of 507 South Fourth Street, Michael Novak and Christopher Strzalka, were members of the Pi Kappa Phi fraternity at the University of Missouri in the fall of 2014. Lucas Reichert, who did not live at the property, served as the "rush chairman" for PKP Fraternity that semester. Novak and his roommates agreed to host a party on Friday, December 12, 2014 and gave Reichert permission to invite potential new members of the fraternity to attend. Reichert informed current and potential new members—"rushees"—about the party. The record reflects that PKP was actively recruiting new members on December 12, 2014, and encouraged potential new members to attend the party. Novak and the other tenants invited other non-fraternity friends to attend as well. There is differing testimony as to how many people attended the party, anywhere from "50–60" to "200, probably less." Attendees were not asked to show identification upon entering the party, and none of the tenants asked any guest to leave.

The only way to access the second story balcony from the interior of the property was through the door of Strzalka's bedroom, which he left open for "people he knew" to place their coats and purses. No key was needed to access the balcony, but it did have a deadbolt that could be locked or unlocked from the inside. Novak testified that he had a conversation with the other tenants and with Lucas Reichert about locking the balcony door. Strzalka testified that he locked the balcony door the night of the party. Even so, Columbia Police believe party attendees had been urinating off the deck throughout the night due to long bathroom lines inside the house.

None of the tenants of 507 South Fourth Street personally invited Jack Lipp to the party, nor did Lucas Reichert. Molly Yrigoyen, whose brother Peter was a member of the PKP Fraternity, invited Jack Lipp to the party around 11:00 p.m. and he arrived sometime thereafter. Around 1:00 or 1:30, student Scott Campbell walked out of Strzalka's bedroom and saw Jack Lipp walk into the bedroom. No more than 15 minutes later, Campbell exited the party and saw

5

Lipp lying on the driveway directly below the second story balcony. He was unconscious and bleeding from his head. On December 25, 2014, Lipp died from his injuries.

## II.   Discussion

In Count I of Plaintiffs' Fourth Amended Complaint, Plaintiffs allege ACC Defendants negligently caused the death of Jack Lipp by failing to maintain the balcony railing, failing to warn of the condition, and failing to inspect or repair that condition. [Doc. 184, pp. 11–19]. ACC Defendants move for Summary Judgment on Count I, asserting that no ACC entity owed a duty to Jack Lipp because: (1) it had no ownership, possession, or control over 507 South Fourth Street; and (2) no ACC entity was engaged in a joint venture, partnership, or agency relationship with Defendants Ginger C or Roland Management. ACC Defendants also move for Summary Judgment on the issue of whether or the ACC Defendants are alter egos of one another. In the event that the Court denies the Motion for Summary Judgment on Count I, ACC also moves for partial summary judgment that there is no support for a claim of aggravating circumstances.

A motion for summary judgment "is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011) (citation omitted). The moving party bears the burden of establishing a lack of genuine issue of fact. *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010). "A judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 868 (8th Cir. 2015) (citation omitted). "Summary judgment is to be granted only where the evidence is such that no reasonable jury

could return a verdict for the non-moving party." *Smith v. Basin Park Hotel, Inc.*, 350 F.3d 810, 813 (8th Cir. 2003) (citation omitted).

### A. Emails as Evidence

Plaintiffs dispute most of ACC Defendants' Material Facts that related to any alleged ownership, control, or possession of 507 South Fourth Street with citations to emails sent or received by various ACC Defendant employees or executive. Defendants deny the majority of Plaintiffs' "Statement of Uncontroverted Facts" relating to the same because "the cited material lacks foundation, and is therefore, inadmissible pursuant to Fed. R. Civ. P. 56(c)(2)." *See* [Doc. 439, pp. 1–36]. The overwhelming majority of documents that ACC Defendants' object to as lacking foundation are the emails. *See id.* at ¶¶ 3, 7, 8, 16, 17, 18, 21–27, 31–39, 42, 43, 50, 51, 68, 73, 74, 76, 81, 82, 84, 85, 87–92, 98–100, 105, 108, 109.

The authenticity of emails is governed by Fed. R. Evid. 901(a) which provides, "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Emails are generally authenticated under FRE 901(b)(4), one of the examples of evidence that satisfies the Rule: "**Distinctive Characteristics and the Like.** The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."

Factors that courts have concluded support authenticity of an email under all the circumstances include the use of the "@" symbol in the email address; that a party's name is included in the email address; that the names of senders and receivers in the headers and body of the email; the nature of the information contained in the email; and that the content of the email shows the sender is familiar with underlying facts of the case. *See, e.g., Devbrow v. Gallegos,*

7

735 F.3d 584, 586-87 (7th Cir. 2013); *U.S. v. Siddiqui,* 235 F.3d 1318, 1322-23 (11th Cir. 2000); and *U.S. v. Safavian,* 435 F.Supp.2d 36, 38-42 (D.D.C. 2006).

The emails proffered by Plaintiffs contain distinctive characteristics supporting the conclusion that they are what they purport to be: emails sent or received by individual employees and executives of ACC Defendants. The email contains email addresses using the "@" symbol, and the employees' name and the name of his or her business; the employees name is reflected in the text; and the nature and the content of the emails relate to the underlying issues in this case.

However, the emails are proffered, in many instances, as evidence of the relationship between Ginger C and ACC or as evidence of ownership, possession, or control over the property at 507 South Fourth Street. Defendants thus argue for their exclusion under the parole evidence rule. While the parol evidence rule does not prevent the admission of relevant evidence, it prohibits the use of such evidence to contradict, vary, or alter the terms of an integrated written contract. *See Missouri Department of Transportation ex rel. PR Developers, Inc. v. Safeco Insurance Company of America,* 97 S.W.3d 21, 32 (Mo. Ct. App. 2002).

"When the language is unambiguous, the intent of the parties is reflected within the language of the contract and the court will determine the parties' intent from the four corners of the document itself." *J.H. Berra Const. Co., Inc. v. Missouri Highway & Transp. Comm'n*, 14 S.W. 3d 276, 279 (Mo. Ct. App. 2000). ACC Defendants urge the Court not to consider the emails, because "the express agreements defined the business relationships between the parties, including the parties' intent, [so] the use of parol evidence to alter those relationships would be improper." [Doc. 439, pp. 40 – 41]. *See Rosenfeld*, 895 S.W. 2d at 135 (court will not look at parol evidence when contract is unambiguous on its face).

Two formal written agreements were executed between Ginger C and ACC: (1) the Agreement for Sale and Purchase of an assemblage of properties, [Doc. 358-6]; and (2) a loan agreement [Docs. 358-34, 358-36–358-38]. "Parol evidence may not be used to create ambiguity in an otherwise unambiguous contract or to show that an obligation is other than that expressed in the written instrument." *Craig v. Jo B. Gardner, Inc.*, 586 S.W.2d 316, 324 (Mo. 1979). Having reviewed the agreements between Ginger C and ACC, the Court agrees that the documents are unambiguous on their face, and the parol evidence rule prohibits the Court from considering contradictory emails in its analysis of whether or not Ginger C and ACC were involved in a joint venture, agency, or partnership business relationship. The Agreement for Sale and Purchase clearly states:

> This Agreement and the exhibits attached hereto contain the entire agreement between the parties, and no promise, representation, warranty, or covenant not included in this Agreement or any such referenced agreements has been or is relied upon by either party . . . No modification or amendment of this Agreement shall be of any force or effect unless made in writing and executed by both Purchaser and Seller.

[Doc. 358-6, p. 29]. Thus, the business relationship set out by the parties—buyer and seller—is a relationship the Court must recognize. The emails Plaintiffs submit to contradict that relationship must be excluded. *See Craig*, 586 S.W.2d at 324 ("While collateral facts and circumstances may be introduced to ascertain the subject matter of the contract and to aid in interpreting it, such facts cannot cause the court to read into the contract something which it does not say.").

Likewise, the loan documents created a business relationship of lender and borrower, and are equally unambiguous on their face:

9

> This Note and the other Credit Documents collectively: (i) constitute the final expression of the agreement between Borrower and Lender concerning the Loan; (ii) contain the entire agreement between Borrower and Lender respecting the matters set fo1ih herein and in such other Credit Documents; and (iii) may not be contradicted by evidence of any prior or contemporaneous oral agreements or understandings between Borrower and Lender. Neither this Note nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

[Doc. 358-34, p. 7]. The parol evidence rule prohibits the Court from considering the emails to contradict, vary, or alter the terms of this integrated written contract. *See Safeco,* 97 S.W.3d at 32. That is true even as to Plaintiffs, non-parties to the written agreements. *See Sullivan v. United States*, 363 F.2d 724, 727 (8th Cir. 1966) ("[T]he invocation of the parol evidence rule by or against a stranger to a contract is permissible.").

However, the parol evidence rule does *not* prohibit the Court from considering the emails when analyzing arguments surrounding possession or control of the property at 507 South Fourth Street. That is because these issues are not necessarily determined by written agreement, and both written agreements are silent on the issue. *See Lahr v. Lamar R–1 Sch. Dist.,* 951 S.W.2d 754, 757–58 (Mo. Ct. App. 1997) ("In deciding intention, conduct is an important factor because actions speak louder than words. Thus, the rule has evolved that where the behavior of an actor is at odds with its professed intent, the former will prevail.") (citing *Barrett v. Parks*, 352 Mo. 974, 180 S.W.2d 665, 666 (Mo. 1944)); *Tiger v. Quality Transp., Inc*., 375 S.W.3d 925 (Mo. Ct. App. 2012) (reversing summary judgment because the defendant's conduct contradicted the defendant's denial of control or maintenance of the property).

Thus, while the Court is prohibited from examining the emails proffered by Plaintiffs as evidence of ownership or a business relationship contradictory to that of buyer/seller or

10

lender/borrower, it can consider them for purposes of analyzing ACC Defendants' alleged possession and control.

## B. Ownership, Possession, and Control

Under Missouri law, landlords are generally protected from liability for personal injuries caused by a dangerous condition existing on the leased premises. *See Stephenson v. Countryside Townhomes, LLC,* 437 S.W.3d 380, 385 (Mo. Ct. App. 2014), *Caples v. Earthgrains, Co,* 43 S.W.3d at 449 (Mo. Ct. App. 2001); *Dean v. Gruber,* 978 S.W.2d 501, 503 (Mo. Ct. App. 1998). "This doctrine of landlord immunity is applicable to shield a landlord from a premises liability claim on property the landlord has leased." *Lewis v. Biegel*, 364 S.W.3d 670, 675 (Mo. Ct. App. 2012). The recognized exceptions to the rule include: (1) a hidden dangerous condition; (2) where the injury occurs in a "common area" used by two or more tenants and/or landlord and tenants; and (3) where the landlord is contractually obligated to make repairs and has retained sufficient control over the premises. *Caples,* 43 S.W.3d at 449.

ACC Defendants contend that summary judgment is proper because ACC owed no duty to Jack Lipp. Plaintiffs contend that that ACC owned, possessed, and controlled the property at 507 South Fourth Street, which could render ACC liable for Lipp's injuries.

### 1. Ownership

Liability is limited to those who own or control the property. *See State ex rel. Union Elec. Co. v. Dolan,* 256 S.W. 3d 77, 83-84 (Mo. banc 2008). Plaintiffs argue that ACC Defendants served as "co-owner" of 507 South Fourth Street when Jack Lipp died. Under the Purchase and Sale agreement between Ginger C and ACC, ACC Defendants did not take title to the property until closing in August 2015, eight months after Jack Lipp's death. [Doc. 358-6]. Under Missouri law, when a buyer and seller enter into a contract for the purchase of real property, the

11

execution of the sales contract splits the seller's legal and equitable ownership rights. *Bath v. Bath,* 233 S.W.3d 742, 743 (Mo. App. S.D. 2007). When a vendor and purchaser enter into a sales contract, equity regards the purchaser as equitable owner of the property and the vendor holds legal title in trust for him. *See Jaycox v. E.M. Harris Bldg. Co.*, 754 S.W. 2d 931, 933 (Mo. Ct. App. 1988); *Schmidt v. City of Tipton*, 89 S.W.2d 569, 572 (Mo. Ct. App. 1936). Although ACC Defendants did not have actual ownership in December 2014, under Missouri law, the Court finds that ACC Defendants had an equitable ownership interest 507 South Fourth Street.

Plaintiffs cite a number of cases that show equitable ownership may allow for liability in certain causes of action where constructive possession is sufficient. *See, e.g.*, *Robson v. Diem*, 317 S.W. 3d 706, 712-13 (Mo. Ct. App. 2010) ) (purchaser under contract is an equitable owner with right to bring an action for quiet title); *Bath v. Bath*, 233 S.W. 3d 742, 743 (Mo. Ct. App. 2007) (mother-in-law who loaned money for purchase of property could not seek to quiet title because she did not have legal title and had no written contract to establish equitable interest); *Allied Pools, Inc. v. Sowash*,, 735 S.W. 2d 421, 424 (Mo. Ct. App. 1987) (couple who had house under construction and ordered a pool to be constructed on the property were equitable owners for purposes of a mechanics lien case); *Hernandez v. Prieto*, 162 S.W. 2d 829, 831 (Mo. Ct. App. 1942) (husband, by placing his wife's name on purchase contract, created an equitable estate in the entirety which was converted to an estate in common through divorce); *Savings Trust of St. Louis v. Skain*, 131 S.W. 2d 566 (Mo. banc 1939) (purchaser who entered contract with bank subsequently in receivership had an equitable interest in liquidation proceedings).

Equitable ownership without possession or control, however, cannot render an equitable owner liable for premises liability or other negligence claims regarding care of the property. *See Jaycox*, 754 S.W. 2d at 933 ("Ordinarily a purchaser of land is not entitled to possession until he

12

has obtained his deed, unless the contract of sale confers a right of possession prior to that time."); *Lawrence v. Bainbridge Apts.*, 919 S.W.2d 566, 569 (Mo. Ct. App. 1996) ("The question presented here is whether a genuine issue of fact exists as to [plaintiff's] assertion that [defendants] retained possession and control of the premises so that respondents owed a duty of reasonable care"). Thus, even with an equitable ownership interest, ACC must have possessed or controlled the property at issue in order for ACC Defendants to be liable for Jack Lipp's injuries. *See Adams v. Badgett*, 114 S.W.3d at 436 (Mo. App. E.D. 2003).

### 2. Possession & Control

ACC owed a duty to Jack Lipp if ACC possessed the property at the time of his injury. *See id*. Missouri has adopted the Restatement (Second) of Torts, which defines the term "possessor" as a party "who is in occupation of the land with intent to control it." Restatement (Second) of Torts § 328E(a). Per that definition, a party may still possess property it does not own. *Richardson v. QuikTrip Corp.*, 81 S.W.3d 54 (Mo. Ct. App. 2002) ("Ownership is not a requirement for possession of the land in order to establish liability . . .").

Plaintiffs contend that ACC Defendants exercised "extensive control" over the property. ACC suggests that the sales contract it signed with Ginger C did not give ACC the "right to possession prior to closing" and therefore, the agreement "did not create a duty on behalf of any ACC entity to the decedent." However, in deciding a possessor's intention to control for purposes of premises liability, Missouri courts recognize that conduct is a more important factor because "actions speak louder than words." *Lahr v. Lamar R–1 Sch. Dist.,* 951 S.W.2d 754, 757–58 (Mo. Ct. App. 1997). Where the behavior of an actor is at odds with its professed intent for purposes of premises liability, "the former will prevail." *Id.* at 758.

13

ACC Defendants contend that "[n]either the original Agreement for Sale and Purchase nor any of the subsequent twelve amendments contained any provisions for a right to possession prior to closing." [Doc. 439, p. 54]. Plaintiffs point out that "a defendant does not have to own property for purposes of premises liability, but must only be found to be a possessor—an analysis which turns on the degree of *control* over the property." [Doc. 398, p. 59]. Plaintiffs point to the following contract provisions to stand for the proposition that ACC Defendants controlled the property:

> (1) "Ginger C was required to perform the maintenance obligations under the tenant leases on the properties, but it could not enter into any new lease agreements, maintenance agreements or management agreements without ACC's permission";

> (2) "ACC had unfettered right to enter upon the assemblage of properties, including the 507 property, with no notice (unless ACC wanted to see any interior portions occupied by tenants)";

> (3) "If Ginger C did not maintain the properties, ACC could terminate the contract";

> (4) "ACC had the right to make any and all inspections and investigations of the properties that it 'deems necessary,' and that right continued past any defined inspection period in the contract";

> (5) "If ACC was not satisfied with any aspect of the properties—for example, if one of the homes perhaps had a broken and temporarily repaired balcony railing that was not code compliant—ACC had the absolute discretion to terminated the contract.";

> (6) Ginger C had to turn over all of its tenant leases, rent rolls, permits, insurance policies, tax statements, utility bills and virtually every type and kind of document related to the properties before the contract was closed"; and

> (7) "In fact, ACC wanted every maintenance and service report for the properties going back years or it had the right to terminated the contract. ACC even demanded copies of applications, correspondence and any credit reports relating to *the tenants* of the properties before closing on the ACC Contract."

*Id.* at 57 (citing [Doc. 358-6]). Further, under the sales contract, ACC had to consent to Ginger C leasing the properties, but in fact ACC directed Ginger C to lease out the properties. Plaintiffs

14

note that without ACC's consent or direction, "there would have been no tenants in the 507 property for the 2014-15 school year. If there were no tenants in the 507 property for the 2014-15 school year, there would have been no house party at the 507 property on December 12, 2014 and Jack Lipp would not have fallen to his death." [Doc. 398, p. 58].

Apart from the sales contract, Plaintiffs also point to the following provisions in the loan documents that secured the purchase of 507 South Fourth Street for evidence of control:

> (1) "The Deed of Trust gave ACC a lien on *all* of Ginger C's properties in the assemblage, not just those few properties for which Ginger C needed money to purchase."
>
> (2) "Ginger C could make no changes or alterations on the property without ACC's prior written consent."
>
> (3) "Ginger C could not use the property securing the Deed of Trust 'inconsistent' with the rights of ACC."
>
> (4) "Ginger C was required to comply with and observe all tenant lease obligations affecting the properties."
>
> (5) "Ginger C had to keep the property in 'good repair and condition at all times.'"
>
> (6) "Ginger C had to comply with all laws, rules and regulations related to the property."
>
> (7) "Ginger C could enter into no new lease related to the properties without ACC's prior written consent."

*Id.* at 59 [citing [Doc. 398-58]. Plaintiffs argue "[t]his is a substantial degree of control." *Id.*

Under Missouri law, a party must possess the property in question in order to be liable for injuries suffered while on that property under both premises liability and general negligence causes of action.[4] Missouri defines the term "possessor" as a party "who is in occupation of the

---

[4]    Plaintiffs Fourth Amended Complaint has been read as a premises liability claim throughout the litigation process. Plaintiffs now argue that they also plead a claim for general negligence. That issue is

15

land with intent to control it." Restatement (Second) of Torts § 328E(a). The right of entry for purposes of inspection and environmental survey, even combined with a final approval authority, cannot controvert ACC Defendants' professed intent to remain an equitable owner with no possession or control.

However, the contract provisions granting *some* control over the property combined with the "Assignment of Leases and Rents" create a genuine issue of material fact that must be sent to the jury. Under that agreement:

> Assignment. Grantor (Ginger C) hereby sells, assigns, transfers, conveys, and sets over unto Lender (ACC OP Development), its successors and assigns, absolutely, and not only as collateral, all of the right, title, and interest of Grantor in, to and under (i) any and all leases, licenses or agreements for the use or occupancy of the whole or any part of the Property . . . and (v) any and all current and future rights, powers, privileges, options and other benefits of Grantor as lessor under the Leases, including, but not by way of limitation . . . The right and option, but not the obligation, to do any and all other things whatsoever which the Grantor is or may become entitled to do under or by virtue of the Leases or any of them.

[Doc. 398-57, p. 1]. Thus, the tenant leases were assigned to and held by ACC, not Ginger C. ACC Defendants argue that the Assignment was not intended to be an immediate assignment, but rather collateral and a method to give ACC "a security interest in the property." [Doc. 358, p. 30]. This runs contrary to ACC's own argument surrounding parol evidence; the above language is unambiguous, and the Court considers the plain language of such an agreement as governing the intent of the properties. Ginger C assigned the lease "absolutely, and not only as collateral." Therefore, ACC was a landlord of the property at 507 South Fourth Street at the time of Jack Lipp's injuries.

A reasonable jury might find that this status is insufficient to hold ACC Defendants liable. But material issues of fact remain as to whether ACC—a landlord over the property in

---

irrelevant to this portion of the Court's analysis because, even in general negligence, a "failure to inspect" arises only after a duty is established.

question with contractual provisions granting ACC a degree of control over that property—possessed 507 South Fourth Street for premises liability purposes. Viewing those facts in the light most favorable to the Plaintiffs and drawing all reasonable inferences in their favor for the purpose of this Motion only, a reasonable jury could find that ACC, while merely an equitable owner at the time, retained sufficient control over the property to render it liable for Jack Lipp's injuries.

Because the Court denies ACC's Motion for Summary Judgment on Count I on the issues of possession and control, the Court need not address the Parties' arguments surrounding an alleged joint venture, agency, or partnership relationship between ACC and Ginger C.

### C. Alter Ego

In ACC Defendants' Motion, ACC argues that the separate ACC entities are not alter egos or agents of one another under Missouri Law. [Doc. 358, pp. 46–50]. It is unclear to the Court from the pleadings whether they do so in order to support their Motion for Summary Judgment on Count I or whether they ask the Court to analyze this argument to shield the parent corporation, ACC Inc., from any liability potentially owed by the other ACC entities. This portion of ACC's Motion simply concludes: "this Court should grant the ACC Defendants' Motion for Summary Judgment as a matter of law on Plaintiffs' alter ego claim." [Doc. 358, p. 50].

Nevertheless, there are five ACC entities named in this suit. Two separate corporations are ordinarily regarded as wholly distinct legal entities, even if one partly or wholly owns the other. *See Mid–Missouri Tel. Co. v. Alma Tel. Co.,* 18 S.W.3d 578, 582 (Mo. Ct. App. 2000); *Grease Monkey Intern., Inc., v. Godat,* 916 S.W.2d 257, 262 (Mo. Ct. App. 1995) ("In the eyes of the law, two different corporations are two different persons. This is true even if one

17

corporation is the sole shareholder of the other."). A parent corporation is generally not liable for the acts of its subsidiary corporations. *Mid–Missouri Tel. Co.,* 18 S.W.3d at 582. In most instances, courts protect the separate legal identities of individual corporations, even if one corporation owns a part or all of the other. *Collet v. Am. Nat. Stores, Inc.,* 708 S.W.2d 273, 283 (Mo.App.1986).

There are, of course, exceptions in which courts will consider alter ego claims. An alter ego theory, often used to "pierce the corporate veil," is an equitable doctrine whereby courts look past the corporate form and impose liability upon owners of the corporation for the acts of its subsidiaries. S*ee generally Edward D. Gevers Heating & Air Conditioning Co. v. R. Webbe Corp.*, 885 S.W.2d 771 (Mo. Ct App. 1994). Courts apply a three-part test to determine whether to pierce the corporate veil. Plaintiffs must demonstrate that: (1) that the parent company exercised such complete control and domination over the subsidiaries that the subsidiaries had no separate mind, will or existence with regard to the conduct at issue; (2) the parent company used its control and domination over the subsidiaries to commit fraud or violations of legal duties in contravention of the Plaintiffs' rights; and (3) the parent company's control of the subsidiaries and breach of duty proximately caused injury to the Plaintiffs. 66 Inc., v. Crestwood Commons Redevelopment Corp., 998 S.W.2d 32, 40 (Mo. banc 1999).

ACC Defendants concede the first point—that ACC Inc. controls the subsidiary and/or related entities, including ACC OP Development (which contracted to purchase with Ginger C) and ACC OP (Turner Ave) LLC (a new ACC entity incorporated after Jack Lipp's death which currently holds title to the property). While the burden is on ACC to prove no issue of material fact exists, Plaintiffs must point to submissible evidence to controvert ACC Defendants' contention that (2) no fraud was committed, and (3) ACC Inc.'s control did not proximately

18

cause Jack Lipp's injuries since they will bear the burden of proof at trial.

Plaintiffs first argue that alter ego status is a question for the jury, particularly when witness credibility is an issue. [Doc. 398, pp. 89–90]. When material issues of fact exist, veil-piercing is a jury question under Missouri law. *See Eagle v. Redmond*, 80 S.W.3d 920, 924 (Mo. Ct. App. 2002). A court's job at the summary judgment stage is not to weigh the evidence or to make credibility determinations, but rather to analyze whether a genuine dispute exists for trial. *See Gibson v. American Greetings Corp.,* 670 F.3d 844, 853 (8th Cir. 2012).

On this issue, genuine issues of material fact exist that preclude summary judgment. Regarding the second prong, Plaintiffs have cited ample support for their proposition that a reasonable jury could find ACC OP Development's sale of the property assemblage to the newly incorporated ACC OP (Turner Ave), originally purchased for $14 million and sold for $10.00, was improper. Considering the timing of the sale—shortly after Lipp's death—and Plaintiffs allegations of intentional inadequate capitalization—ACC OP now holds tangible assets worth less than $200,000—a reasonable jury could agree with Plaintiffs' inference that the sale represented "improper purpose or reckless disregard for the rights of others." *See Collet v. American Nat. Stores, Inc*., 708 S.W.2d 273, 284 (Mo. Ct. App. 1986). *See also Radaszewski by Radaszewski v. Telecom Corp.,* 981 F.2d 305, 308 (8th Cir. 1992) ("Undercapitalizing a subsidiary, which we take to mean creating it and putting it in business without a reasonably sufficient supply of money, has become a sort of proxy under Missouri law for the second Collet element . . . The reason, we think, is not because undercapitalization, in and of itself, is unlawful (though it may be for some purposes), but rather because the creation of an undercapitalized subsidiary justifies an inference that the parent is either deliberately or recklessly creating a business that will not be able to pay its bills or satisfy judgments against it.").

19

ACC Defendants argue that the common business practice of "transferring assets to a special purpose entity for development and/or management . . . does not represent undercapitalization and certainly does not represent an improper purpose." [Doc. 439, p. 61]. That may very well be, but viewing the facts in the light most favorable to the Plaintiffs and drawing all reasonable inferences in their favor for the purposes of this Motion only, a reasonable jury could find that the transfer represents an improper use. *See 66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32, 41 (Mo. 1999) (rejecting the defendant's "common practice" argument and finding "actual fraud is not necessary for a court to hold shareholders liable for corporate debts.").

On the causation prong, Plaintiffs and ACC Defendants agree that *Collet* stands for the proposition that when the action of the dominant corporate entity renders the subservient corporation insolvent, then the requisite injury and causal connection is established. *Collet*, 708 S.W. 2d at 287 (describing insolvency as leaving a company an empty hulk, devoid of substance to satisfy the legitimate demands of its other creditors). ACC Defendants maintain that ACC OP Development is not insolvent, thus rebutting *Collet*'s causation support.

Yet if a jury rendered a verdict against ACC OP Development, it may "not be able to pay its bills or satisfy judgments against it." *Id* (finding insolvency despite no formal bankruptcy proceeding because "[a]ccording to the industry's standards, [defendant] was grossly undercapitalized."); *see also 66, Inc.*, 998 S.W.2d at 41. While Plaintiffs' have not proven ACC OP Development was undercapitalized to the point of insolvency, ACC Defendants have the burden in this Motion of proving a lack of disputed material fact. ACC Defendants have taken the position that only ACC OP Development had an actual contract with 507 South Fourth Street, and ACC OP Development has tangible assets worth less than $200,000.

20

Disputed issues of material fact remain on Plaintiffs' alter ego claim, and ACC Defendants' Motion for Summary Judgment on that issue is denied.

### D. Aggravating Circumstances Damages

Finally, ACC Defendants move for Partial Summary Judgment on Plaintiffs' claim for "aggravating circumstances" damages. For purposes of the Plaintiffs' burden of proof, Missouri law treats damages for aggravating circumstances damages as "akin" to punitive damages. *Betts-Lucas v. Hartmann*, 87 S.W.3d 310, 326 (Mo. App. W.D. 2002). In Missouri, courts and juries impose punitive damages to punish unlawful conduct and deter its repetition. *Henderson v. Fields*, 68 S.W.3d 455, 486 (Mo. App. W.D. 2001). In negligence cases, "[o]rdinarily [punitive damages] are not recoverable … because negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct." *Hoover's Dairy, Inc. v. Mid- America Dairymen, Inc./Special Products*, Inc., 700 S.W.2d 426, 435 (Mo. banc 1985).

Missouri courts have observed that the Missouri wrongful death statute has allowed for a jury to award "damages as they may deem fair and just, . . . and, also, having regard to the mitigating or aggravating circumstances attending such wrongful act, neglect or default." *Bennett v. Owens-Corning Fiberglas Corp.,* 896 S.W.2d 464 (Mo. banc 1995). "Early cases interpreted the authorization for damages based on aggravating circumstances to allow exemplary or punitive damages . . . At least since 1979, the damages attributed to 'aggravating circumstances' necessarily refers only to punitive damages." *Id.*

Under Missouri law, punitive damages are available in negligence actions "only when the defendant knew or had reason to know that there was a high degree of probability that the action would result in injury." *Hoover's Dairy*, 700 S.W.2d at 436 (describing an individual's firing of a rifle into a moving passenger train as an example of a defendant who knew or should have

21

known that there was a high degree of probability that his conduct would result in injury). "The defendant's conduct must be tantamount to intentional wrongdoing where the natural and probable consequence of the conduct is injury. With such a showing, a plaintiff can recover for aggravating circumstances based upon the defendant's complete indifference to or conscious disregard for the safety of others." *Lopez v. Three Rivers Electric Coop., Inc.*, 26 S.W.3d 151, 160 (Mo. banc 2000). Therefore, to obtain punitive damages in a negligence action, the "plaintiff must show conduct more egregious than that on which the claim of negligence is based." *Litchfield v. May Dept. Stores Co.*, 845 S.W.2d 596, 599 (Mo. App. Ct. 1992).

Plaintiffs will have the burden at trial of establishing that ACC Defendants should be liable for aggravating circumstances damages. It must therefore point to submissible evidence that shows ACC's "complete indifference to or conscious disregard for the safety of others." *Lopez*, 26 S.W.3d at 160. Plaintiffs first contend they have submitted such evidence against Ginger C, and argue that Ginger C was the agent of ACC and/or ACC and Ginger C were involved in a joint venture. [Doc. 398, pp. 86–87].

Plaintiffs also point to the following facts supporting a finding that punitive damages would be appropriate based solely on ACC's own conduct:

(1) "ACC ordered Ginger C to get tenants into the rental properties in the assemblage but took no action to inspect or determine whether those properties were safe before doing so. In fact, it had no clue about the safety conditions of the assemblage properties because that 'was not (ACC's) concern.'"
(2) "Jack Lipp's death was preventable because ACC had the right to inspect every inch of the 507 property before he fell to ensure it was code compliant, but ACC refused to do so."
(3) "ACC had the right to ask Ginger C about the condition of the 507 property, but ACC refused to do so."
(4) "ACC had the right to terminate its land purchase contract with Ginger C if Ginger C did not maintain the 507 property in proper condition, but ACC refused to do so."
(5) "ACC had employees working within two miles of the 507 property the day Jack Lipp fell and ACC could have had those employees do a simple drive-by inspection of the 507

22

property, but ACC refused to do so. That failure to act is even more egregious because ACC knew most of the structures situated on the Ginger C assemblage were 'at the end of their useful lives' and some were structurally unsound."

(6) "ACC's main guy Chuck Carroll knew that from his own personal observations of those properties. Yet still, ACC did nothing to ensure the properties were safe."

[Doc. 398, p. 88]. Plaintiffs finally note ACC's "post-death" transferring its to ACC OP (Turner Ave) as evidence of ACC's "callous indifference" warranting punitive damages.

The Court defers ruling on the issue of aggravated circumstances damages at this time.

## III.    Conclusion

For the foregoing reasons, ACC Defendants' Motion for Summary Judgment, [Doc. 357], is denied. ACC Defendants' Motions for Summary Judgment on Count I of Plaintiffs' Amended Complaint and on the issue of alter ego status are denied. The Court defers ruling on ACC Defendants' Motion for Partial Summary Judgment as to aggravated circumstances damages.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  January 19, 2017
Jefferson City, Missouri