IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| JOHN P. LIPP and STEPHANIE S. LIPP, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 2:15-cv-04257-NKL |
| | ) |
| GINGER C, L.L.C., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**ORDER**

Before the Court is Defendant Ginger C, LLC's Motion for Summary Judgment, [Doc. 359]. For the following reasons, Defendant's Motion is denied.

**I.   Background[1]**

Plaintiffs, the surviving parents of Jack Lipp, filed suit alleging negligence against Defendants Ginger C, L.L.C., American Campus Communities (ACC), and Roland Management. The suit stems from Lipp's death, which occurred after he fell off a balcony at 507 South Fourth Street in Columbia, Missouri while attending a party on December 12–13, 2014. Plaintiffs allege Jack Lipp fell because of a defective railing on the balcony.

**A.  507 South Fourth Street**

Defendant Ginger C leases housing for students, with approximately 50 units rented to students in 2015. On October 22, 2014, Defendant Ginger C closed on a contract to purchase the property located at 507 South Fourth Street from Derrow Properties, LLLP. Derrow sold the

---

[1]   Unless otherwise noted, the facts recited are those which are properly supported and undisputed. These findings are for purpose of this Motion for Summary Judgment only.

property to Ginger C on an "as is basis," without providing a seller's disclosure statement. Ginger C's sole member, Nakhle Asmar, testified that Ginger C performs "due diligence" when it purchases properties.

City of Columbia Ordinance § 22-192 provides in pertinent part that, upon the transfer of legal title of any dwelling, the transferee shall either: "Apply for a certificate of compliance or a provisional certificate of compliance" or:

> (2) Apply to transfer an existing certificate by complying with subsection (b) of this section.
> (b) If the transfer of title occurs within eighteen (18) months of the last satisfactory city rental inspection, and if there have been no complaints regarding the property, the transferee may cause an existing certificate to be transferred for the unexpired portion of the term for which it was issued upon making written application to the community development department, on forms to be supplied by the community development department, within fifteen (15) days from the date of the transfer of title and upon payment of a ten dollar ($10.00) transfer fee per building.

Mr. Asmar testified to his understanding of this provision: "I have 15 days to look into whether the property has a certificate of compliance. And if it does, whether the certificate is transferable or whether a new certificate is – an application for a new certificate is required. So, 15 days from the day of purchase you initiate the application."[2] [Doc. 409-1, p. 12]. Ginger C did not file the application for certificate of compliance until November 20, 2014, 29 days after closing on the property.

The property was leased to four tenants at the time of closing, and Derrow assigned its lease with the tenants to Ginger C. The lease agreement between Ginger C and the tenants of the property provides:

> LESSOR or LESSOR's agent shall be entitled and shall have the right at all reasonable times to inspect said premises for any damage or destruction or to determine whether or not LESSEE is performing and observing the covenants and

---

[2] Ginger C denies that the ordinance provision referred to actually reads as Mr. Asmar testified.

2

Case 2:15-cv-04257-NKL   Document 455   Filed 01/19/17   Page 2 of 16

>agreements herein contained, and for the purpose of making any necessary repairs.

[Doc. 404-2, p. 2]. When Ginger C took over the lease, the tenants received a notice that stated in part, "[f]or maintenance, please call Roland." The notice provided Defendant Roland Management's cell phone number as well as Mr. Asmar's cell phone number and email address. Mr. Asmar testified that Roland Management typically performed repairs "[i]f something were broken and reported to us."

There was a balcony on the second floor of the property.[3] The only way to access the second story balcony from the interior of the property was through the door in one of the bedrooms.[4] Christopher Strzalka, the tenant whose bedroom could access the balcony, testified that he kicked the balcony railing off of the balcony prior to September 2014. One of Derrow's maintenance employees made a temporary repair to the balcony railing with two inch by four inch boards in September 2014 after Strzalka had kicked it off. Ginger C was made aware of the balcony condition and the temporary repair.

Before Ginger C closed on the property, Mr. Asmar "walked around the outside" of the home with his realtor. After closing, Derrow employees took Mr. Asmar into the house for a final walk-through and did so without informing the tenants, opening the home with the landlord's own set of keys. Mr. Asmar and the Derrow employees say they did not walk through any of the tenants' bedrooms during the inspection. The Derrow employees testified that the tenants of the property had been problematic and that there had been "half a dozen calls for

---

[3] Plaintiffs deny this fact because Mr. Asmar stated that he did not think the structure was actually a balcony but rather thought it was part of the building's roof with a decorative railing. [Doc. 404, p. 2]. How Ginger C classified the structure is not at issue; all Parties note the existence of a balcony on the second floor.
[4] Plaintiffs deny this fact again citing Mr. Asmar's statement that he did not think the structure was a balcony. *Id.* Mr. Asmar's statement only addresses nomenclature.

3

repairs," but that the only question Ginger C asked was "do the tenants pay rent." [Doc. 430, p. 25].

Ginger C argues that "no tenant of 507 South Fourth Street contacted Mr. Asmar to complain about the property prior to Jack Lipp's injuries." Plaintiffs deny this, noting that Mr. Asmar informed the Columbia Police Department that the tenants had complained to him about the balcony's condition. Ginger C objects to this statement because it cites to the Columbia Police Department's "Followup Report," [Doc. 409-16], which Ginger C maintains is "unauthenticated and inadmissible hearsay . . . that does not even support the proposition" Plaintiffs stated. The Court disagrees; the police department record is admissible under Fed. R. Evid. 803(8)(A)(iii), and Mr. Asmar's statement is admissible under Fed. R. Evid. 801(d)(2).

Ginger C and Defendant Roland Management contend that Roland Nabhan first visited the property the day Jack Lipp fell from the balcony. Similarly, Ginger C contends that "[n]either Ginger C nor anyone on its behalf performed maintenance at 507 S. Fourth Street before the party of December 12–13, 2014." Plaintiffs deny this, noting Mr. Nabhan's testimony that he attends City of Columbia inspections on Ginger C properties and had keys to the home, and citing to a City of Columbia HVAC Inspection Report, [Doc. 409-17]. Ginger C argues the HVAC Inspection Report is "objectionable, inadmissible hearsay." Through the Parties' limited briefing on the admissibility of this evidence, it appears this Inspection Report is admissible under Fed. R. Evid. 803(6), but this finding is subject to reconsideration during pretrial evidentiary motions.

### B. December 12 – 13, 2014

Two of the tenants of 507 South Fourth Street, Michael Novak and Christopher Strzalka, were members of the Pi Kappa Phi fraternity at the University of Missouri in the fall of 2014.

4

Lukas Reichert, who did not live at the property, served as the "rush chairman" for PKP Fraternity that semester. Novak and his roommates agreed to host a party on Friday, December 12, 2014 and gave Reichert permission to invite potential new members of the fraternity to attend. Reichert informed current and potential new members—"rushees"—about the party. The record reflects that PKP was actively recruiting new members on December 12, 2014, and encouraged potential new members to attend the party. Novak and the other tenants invited other non-fraternity friends to attend as well. There is differing testimony as to how many people attended the party, anywhere from "50–60" to "200, probably less." *See* [Doc. 430, p. 8]. Attendees were not asked to show identification upon entering the party, and none of the tenants asked any guest to leave.

The only way to access the second story balcony from the interior of the property was through the door of Strzalka's bedroom, which he left open for "people he knew" to place their coats and purses.[5] At some point in the evening, two people went inside Strzalka's bedroom and locked the door. After learning this, Strzalka knocked and eventually kicked the door open.[6] No key was needed to access the balcony, but it did have a deadbolt that could be locked or unlocked from the inside. Novak testified that he had a conversation with the other tenants and with Lucas Reichert about locking the balcony door.[7] Strzalka testified that he locked the balcony door the night of the party[8] because he didn't want any guests to go out there, "because

---

[5] Plaintiffs deny this fact citing Mr. Asmar's statement that he did not think the structure was a balcony. *Id.* This statement relates to nomenclature.

[6] Plaintiffs deny this fact by citing Strzalka's testimony that he himself had not locked the door to his bedroom. [Doc. 404, p. 18]. This does not contradict Strzalka's testimony that the two people who entered his room locked the door.

[7] Plaintiffs deny this fact by noting that Strzalka did not lock his bedroom door, which does not contradict the testimony concerning the deadbolt lock on the door to the balcony.

[8] *Id.*

5

it was unsafe." Even so, Columbia Police believe party attendees had been urinating off the deck throughout the night due to long bathroom lines inside the house.

None of the tenants of 507 South Fourth Street personally invited Jack Lipp to the party, nor did Lukas Reichert.[9] Molly Yrigoyen, whose brother Peter was a member of the PKP Fraternity, invited Jack Lipp to the party around 11:00 p.m. and he arrived sometime thereafter. Ms. Yrigoyen testified that she saw Lipp speaking with "older guys in the frat," although she did not know their names.

Around 1:00 or 1:30, student Scott Campbell walked out of Strzalka's bedroom and saw Jack Lipp walk into the bedroom. No more than 15 minutes later, Campbell exited the party and saw Lipp lying on the driveway directly below the second story balcony. He was unconscious and bleeding from his head. On December 25, 2014, Lipp died from his injuries.

On December 13, 2014, the morning after the party, Roland Management placed a deadbolt on the balcony door in order to render it unusable. It took "approximately five or ten minutes" to do so.

## II. Discussion

In Count II of Plaintiffs' Fourth Amended Complaint, Plaintiffs allege Defendant Ginger C negligently caused the death of Jack Lipp by failing to maintain the balcony railing, failing to warn of the condition, and failing to inspect or repair that condition. [Doc. 184, pp. 24–29]. Ginger C moves for Summary Judgment on Count II via two separate arguments that Ginger C

---

[9] When asked if he invited Jack Lipp to the party, Novak and tenant Charles Smith both testified "No." When asked if he knew who invited Jack Lipp, Strzalka testified "No." Regarding rush-chair Lucas Reichert, he testified as follows:
    Q: Do you have any knowledge of who Jack Lipp was? A: No.
    Q: Did you ever meet Jack Lipp? A: No.
    Q: Did you ever see him arriving at the party?   A: No.
    Q: Did you invite him?  A: I did not.
[Doc. 430-4, p. 3].

did not owe a legal duty to Jack Lipp because: (1) it neither retained nor exercised *actual* control of the second story balcony of 507 South Fourth Street and was not a possessor of the leased property; and (2) Jack Lipp was a trespasser at the time of his injuries. In the event that the Court denies the Motion for Summary Judgment on Count II, Ginger C also moves for partial summary judgment (3) that Jack Lipp was not an invitee; and (4) that Plaintiffs cannot prove their entitlement to aggravating circumstances damages with clear and convincing evidence.

A motion for summary judgment "is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011) (citation omitted). The moving party bears the burden of establishing a lack of genuine issue of fact. *Brunsting v. Lutsen Mountains Corp.,* 601 F.3d 813, 820 (8th Cir. 2010). "A judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 868 (8th Cir. 2015) (citation omitted). "Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party." *Smith v. Basin Park Hotel, Inc.*, 350 F.3d 810, 813 (8th Cir. 2003) (citation omitted).

### A. Possession & Control

Under Missouri law, landlords are generally protected from liability for personal injuries caused by a dangerous condition existing on the leased premises. *See Stephenson v. Countryside Townhomes, LLC,* 437 S.W.3d 380, 385 (Mo. Ct. App. 2014), *Caples v. Earthgrains, Co,* 43 S.W.3d at 449 (Mo. Ct. App. 2001); *Dean v. Gruber,* 978 S.W.2d 501, 503 (Mo. Ct. App. 1998). "This doctrine of landlord immunity is applicable to shield a landlord from a premises liability

7

claim on property the landlord has leased." *Lewis v. Biegel*, 364 S.W.3d 670, 675 (Mo. Ct. App. 2012). The recognized exceptions to the rule include: (1) a hidden dangerous condition; (2) where the injury occurs in a "common area" used by two or more tenants and/or landlord and tenants; and (3) where the landlord is contractually obligated to make repairs and has retained sufficient control over the premises. *Caples,* 43 S.W.3d at 449.

To maintain a premise liability claim, Plaintiffs must establish that (1) Ginger C "possessed" the property at 507 South Fourth Street, *Adams v. Badgett*, 114 S.W.3d 432, 436 (Mo. Ct. App. 2003), and (2) that Ginger C owed Lipp a duty of care, *Woodall v. Christian Hosp. NE-NW*, 473 S.W.3d 649, 653 (Mo. Ct. App. 2015). Ginger C owed a duty to Lipp if (1) Ginger C possessed the property at the time of his injury; and (2) Lipp was not trespassing at the time of his injuries. *See Adams v. Badgett*, 114 S.W.3d at 436 (Mo. Ct. App. 2003).

Missouri has adopted the Restatement (Second) of Torts, which defines the term "possessor" as a party "who is in occupation of the land with intent to control it." Restatement (Second) of Torts § 328E(a). Per that definition, a party may still possess property it does not own. *Bowman v. McDonald's Corp.*, 916 S.W.2d 270, 285 (Mo. Ct. App. 1995), *overruled on other grounds by Richardson v. QuikTrip Corp.*, 81 S.W.3d 54 (Mo. Ct. App. 2002) ("Ownership is not a requirement for possession of the land in order to establish liability . . ."). The majority view under Missouri law considers the dispositive question to be "whether the landlord did retain control of the particular portion of the premises under consideration." *Dean*, 978 S.W.2d at 504. Missouri law distinguishes between a landlord's right to control and a landlord's actual control: "The mere reservation of a right by a landlord to enter and inspect an apartment or make improvements and repairs does not by itself, create liability." *Stephenson*, 437 S.W.3d at 386 (citing *McKinney*, 123 S.W.3d at 282).

8

In *Lemm v. Gould,* 425 S.W.2d 190, 195 (Mo. 1968), tenants filed suit against their landlords after a child fell from a fourth-floor porch that tenants claimed had not been adequately repaired by the landlords. *Id.* at 191. Before deliberations, the trial court submitted to the jury a verdict-directing instruction which required the jury to determine whether the porch "was in the possession and control of [the landlord] . . . for the purpose of making repairs." *Id.* at 193. The jury returned a verdict for the tenants and the landlords appealed, challenging the issue of control submitted in the verdict-directing instruction and the denial of a directed verdict. *Id.* On appeal, the Missouri Supreme Court found there was sufficient evidence from which the jury could infer that the landlords were vested with the degree of control over the premises to obligate them to maintain the porch in a reasonably safe condition for the tenants and their children. *Id.* at 195.

The court found the obligation to make repairs and the right to enter the premises are insufficient without *some additional facts* from which a jury can reasonably infer that the landlord retained the requisite degree of control necessary to render it liable based on a duty to make repairs. *Id.* (emphasis added). In *Lemm*, "some evidence of control" included the fact that the landlords retained a duplicate key to enter the tenants' apartment "on their own initiative" to make any repairs that the landlords deemed necessary, without consulting with tenants or obtaining their consent. *Id.* From this evidence, the jury could infer that the landlords essentially had "free access to the premises" to make repairs and replace any items they determined were necessary. *Id.*

In *Stephenson v. Countryside Townhomes, LLC*, 437 S.W.3d 380, 385 (Mo. Ct. App. 2014), a child fell out of a window that was in disrepair at a large multi-unit apartment complex. The mother filed suit against the owner of the apartment building alleging that the landlord had retained control over the premises and was obligated to make repairs to the window despite the

9

Case 2:15-cv-04257-NKL   Document 455   Filed 01/19/17   Page 9 of 16

fact that there was no "notice" to the landlord regarding the condition of the balcony. *Id.* After noting that there was conflicting evidence with regard to the landlord's control, the Court held that the issue of the landlord's control was a question for the jury. *Id.* at 389. The court noted that there was no evidence that the landlord had "free access" to the premises to make repairs at their own discretion without notifying tenants, no evidence of random repairs on the landlords own initiative, and there was evidence that the maintenance staff made repairs only after being notified by the tenant. *Id.* The court still found the question should be sent to the jury.

In this case, a dispute exists as to whether the landlord retained control over the balcony at 507 South Fourth Street and the issue of control must be submitted to the jury. *See Caples v. Earthgrains Co.,* 43 S.W.3d 444, 450 (Mo. Ct. App. 2001). Ginger C had keys to the property. The lease stated that Ginger C or its agent "shall be entitled and shall have the right at all reasonable times to inspect said premises for any damage or destruction . . . and for the purpose of making any necessary repairs." [Doc. 404-2, p. 2]. The tenants never made repairs to the balcony. When the balcony had to be repaired in September 2014, the landlord—then Derrow Properties—conducted the maintenance. Ginger C argues that neither it nor its maintenance employee Roland Management made repairs and thus contends it did not retain control, but Ginger C took over the lease in its entirety and Mr. Asmar was made aware of the balcony condition.

Further, there are disputed issues of material fact surrounding control over portions of the premises. At the beginning of the lease, the tenants did not have access to the third floor of the home and the door to the third floor remained locked. Only Ginger C had the keys to the third floor. Thus, Mr. Asmar testified that Ginger C retained control of the third floor of the property.

Viewing the evidence in the light most favorable to Plaintiffs for the purpose of this Motion only, a reasonable jury could find that Ginger C retained control over the balcony for the purpose of conducting repairs to the balcony railing. Ginger C's Motion for Summary Judgment on the issues of control and possession is denied.

### B. Jack Lipp's Entrant Status

#### 1. Trespass

Ginger C argues that it owed no duty to Jack Lipp because he was a trespasser at the time he fell. Premises liability cases recognize three broad classes of plaintiffs: trespassers, licensees and invitees. *Carter*, 896 S.W.2d at 928. The distinction may be crucial because "[w]hen a plaintiff sues a possessor of land for injuries arising out of an unreasonably dangerous condition on that land, the standard of care owed by the defendant is defined by the relationship existing between the possessor of the land and the plaintiffs." *Harris v. Niehaus*, 857 S.W.2d 222, 225 (Mo. 1993). Whereas a landowner must only warn licensees of known dangers, the landowner owes a duty to protect invitees against both known dangers and those that would be revealed by inspection. *Carter v. Kinney*, 896 S.W.2d 926, 928 (Mo. banc. 1995). A landowner owes no warning to a trespasser. *See Ryan v. Rademacher*, 142 S.W.3d 846, 849 (Mo. Ct. App. 2004).

"All entrants to land are trespassers until the possessor of land gives them permission to enter." *Id.* A licensee "is a person who is privileged to enter or remain on land only by virtue of the possessor's consent." Restatement (Second) of Torts, § 330 (1965). An invitee, by contrast, is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." *Id.* at § 332. All persons who enter a premises with permission are licensees until the possessor has an interest in the visit. *Carter*, 896 S. W. 2d at 928. "The fact that an invitation underlies a visit does not render the visitor an invitee

11

for purposes of premises liability law." *Id.*

Ginger C's central argument is that Jack Lipp trespassed on the night of the party at 507 South Fourth Street first when he entered the home and then, even if he hadn't originally been trespassing, when he entered Strzalka's room and the balcony. First, Ginger C contends that "no tenant, nor any person with permission to invite guests to the party, invited Jack Lipp," so he was trespassing when he entered the party. The record shows, however, that Jack Lipp was invited to the party by Molly Yrigoyen, who was PKP-member Peter Yrigoyen's younger sister. Lipp also talked to other fraternity members at the party. None of the tenants asked Lipp to leave the party. [Doc. 404, pp. 24–25, 38]. No one checked identification at the door and it appears that a number of fraternity members invited friends to the party. *Id.* at 25. A reasonable jury could find that Lipp was not trespassing when he entered and remained at the party.

Ginger C then argues that, even if Lipp was a licensee or an invitee when he entered the party, he exceeded the scope of that license or invitation when he entered Strzalka's bedroom and went out the balcony door. *See Hogate v. Am. Golf Corp.*, 97 S.W.3d 44, 48 (Mo. App. E.D. 2002) ("[A]ny deviation from the scope of the invitation can reduce the status of an entrant and the duty of the possessor."). Yet Strzalka's bedroom was not locked and various party attendees went into the room throughout the evening, with Strzalka's permission. [Docs. 404, p. 21, 404-11]. Columbia Police believe party attendees had been urinating off the deck throughout the night due to long bathroom lines inside the house. A reasonable jury could find that the tenants of 507 South Fourth Street intended to and did allow party attendees into the room so that Jack Lipp was not trespassing there either.

Viewing the evidence in the light most favorable to Plaintiffs for the purpose of this Motion, a reasonable jury could find that Jack Lipp was not trespassing at the time of his

injuries.

## 2. Invitee

Ginger C also moves for partial summary judgment that Jack Lipp was not an invitee at the party. Plaintiffs' filed a Motion for Partial Summary Judgment as to the Entrant Status of Jack Lipp, [Doc. 373], asking the Court to find Jack Lipp was an invitee at the time of his injuries.

Plaintiffs contend that the fraternity controlled the property during the party, citing the recruitment practices surrounding "rush parties" and an "invite list" including 10-15 names of potential PKP recruits. [Doc. 374].[10] Plaintiffs point to evidence that the PKP Fraternity gained a material benefit from the party, thus categorizing Jack Lipp as an invitee. An invitee is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land. Restatement (Second) of Torts § 332 (1965). The duty owed to an entrant is by the possessor of the property; the expectation of material benefit necessary to create invitee status flows to the possessor, not to others. *Carter v. Kinney*, 896 S. W. 2d 926, 928 (Mo. banc 1995). Plaintiffs contend that "all of the defendants were 'possessors' of 507 S. Fourth Street, along with the fraternity and the tenants as well, to one degree or another." [Doc. 444, p. 1].

Defendants, conversely, argue that Jack Lipp could not have been an invitee because the tenants of 507 South Fourth Street, not the PKP Fraternity, possessed the premises.

The Court defers ruling on the entrant status of Jack Lipp at this time.

## C. Aggravating Circumstances Damages

Finally, Ginger C moves for Partial Summary Judgment on Plaintiffs' claim for "aggravating circumstances" damages. For purposes of the Plaintiffs' burden of proof, Missouri

---

[10] Alternatively, Plaintiffs argue that the party was open to the public.

law treats damages for aggravating circumstances damages as "akin" to punitive damages. *Betts-Lucas v. Hartmann*, 87 S.W.3d 310, 326 (Mo. App. W.D. 2002). In Missouri, courts and juries impose punitive damages to punish unlawful conduct and deter its repetition. *Henderson v. Fields*, 68 S.W.3d 455, 486 (Mo. App. W.D. 2001). In negligence cases, "[o]rdinarily [punitive damages] are not recoverable … because negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct." *Hoover's Dairy, Inc. v. Mid- America Dairymen, Inc./Special Products*, Inc., 700 S.W.2d 426, 435 (Mo. banc 1985).

Missouri courts have observed that the Missouri wrongful death statute has allowed for a jury to award "damages as they may deem fair and just, . . . and, also, having regard to the mitigating or aggravating circumstances attending such wrongful act, neglect or default." *Bennett v. Owens-Corning Fiberglas Corp.,* 896 S.W.2d 464 (Mo. banc 1995). "Early cases interpreted the authorization for damages based on aggravating circumstances to allow exemplary or punitive damages . . . At least since 1979, the damages attributed to 'aggravating circumstances' necessarily refers only to punitive damages." *Id.*

Under Missouri law, punitive damages are available in negligence actions "only when the defendant knew or had reason to know that there was a high degree of probability that the action would result in injury." *Hoover's Dairy*, 700 S.W.2d at 436 (describing an individual's firing of a rifle into a moving passenger train as an example of a defendant who knew or should have known that there was a high degree of probability that his conduct would result in injury). "The defendant's conduct must be tantamount to intentional wrongdoing where the natural and probable consequence of the conduct is injury. With such a showing, a plaintiff can recover for aggravating circumstances based upon the defendant's complete indifference to or conscious disregard for the safety of others." *Lopez v. Three Rivers Electric Coop., Inc.,* 26 S.W.3d 151,

160 (Mo. banc 2000). Therefore, to obtain punitive damages in a negligence action, the "plaintiff must show conduct more egregious than that on which the claim of negligence is based." *Litchfield v. May Dept. Stores Co.*, 845 S.W.2d 596, 599 (Mo. App. Ct. 1992).

Plaintiffs will have the burden at trial of establishing that Ginger C should be liable for aggravating circumstances damages. It must therefore point to submissible evidence that shows Ginger C's "complete indifference to or conscious disregard for the safety of others." *Lopez*, 26 S.W.3d at 160. Plaintiffs state the following as such evidence:

> Ginger C was a possessor of the 507 property and exerted substantial control over the property. Ginger C had the right and ability to inspect every inch of the 507 property before Jack Lipp fell to ensure it was code compliant. Ginger C had a duty to complete due diligence inspections of the property yet it did not do so. Simply put, Ginger did nothing to assess the condition of this new property of which it was leasing to students because it was going to be torn down.

[Doc. 404, p. 50]. The Derrow employees testified that the tenants of the property had been problematic and that there had been "half a dozen calls for repairs," but that the only question Ginger C asked was "do the tenants pay rent." [Doc. 430, p. 25]. Plaintiffs also allege that, because Ginger C denied knowledge of the balcony condition even after Lipp's fall, a jury could infer conscious disregard for the safety of others.

The Court defers ruling on the issue of aggravated circumstances damages at this time.

### III. Conclusion

For the foregoing reasons, Ginger C's Motion for Summary Judgment, [Doc. 359], is denied. Ginger C's Motion for Summary Judgment on Count II of Plaintiffs' Amended Complaint is denied. The Court defers ruling on Ginger C's Motions for Partial Summary Judgment that Jack Lipp was not an invitee and on the issue of aggravating circumstances damages.

                                                             s/ Nanette K. Laughrey
                                                             NANETTE K. LAUGHREY
                                                             United States District Judge

Dated:  January 19, 2017
Jefferson City, Missouri